## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
AMANDA HOLLEY,                               :
                                             :
          Plaintiff,                         :
                                             :
     v.                                      :
                                             :        Civil Action No. 14-7534-BRM-DEA
PORT AUTHORITY OF NEW YORK       :
AND NEW JERSEY; PORT AUTHORITY :
OF NEW YORK AND NEW JERSEY       :
POLICE DEPARTMENT;               :
SUPERINTENDENT MICHAEL A.        :
FEDORKO; CHIEF MICHAEL BROWN; :
SERGEANT ERICK TORRES; and       :               **OPINION**
JOHN AND JANE DOES 1-10, (fictitious :
names),                                      :
                                             :
          Defendants.                        :
_____:

**MARTINOTTI, DISTRICT JUDGE**

  Before this Court is Defendants Port Authority of New York and New Jersey (the "Port Authority"), Superintendent Michael A. Fedorko ("Superintendent Fedorko"), Chief Michael Brown ("Chief Brown"), and Sergeant Erick Torres' ("Sergeant Torres," together with Superintendent Fedorko and Chief Brown, the "Individual Defendants") (all defendants collectively, "Defendants") Motion for Summary Judgment against Plaintiff Amanda Holley ("Plaintiff"). (ECF No. 56.) Plaintiff opposes the Motion. (ECF No. 90.) Pursuant to Federal Rule of Civil Procedure 78(a), the Court heard oral argument on July 17, 2017. (ECF No. 93.) For the reasons set forth below, Defendants' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.

# I.  BACKGROUND

## A.  Plaintiff's Admission to the Port Authority Recruiting Class

The Port Authority is a bi-state agency created in 1921 between the States of New York and New Jersey with the consent of the Congress of the United States. (Defs.' Statement of Facts (ECF No. 56-1) ¶ 14 and Pl.'s Opp. to Statement of Facts (ECF No. 90-2) ¶ 14.) In 2007, Plaintiff took and passed the Port Authority of New York and New Jersey Police admission test and waited for the Port Authority to hold a recruit class. (Pl.'s Suppl. Facts (ECF No. 90-3) ¶ 1 and Def.'s Resp. to Suppl. Facts (ECF No. 91-8) ¶ 1.) In March 2013, Plaintiff submitted an employment application to the Port Authority seeking a position as a Port Authority Police Officer. (ECF No. 56-1 ¶ 51 and ECF No. 90-2 ¶ 51.) The application contained an "Equal Opportunity Employer Statement," which stated:

> Port Authority/PATH policy forbids discrimination because of Race/Color, Religion, Sex, Sexual Orientation, national origin, age and Disability or any other status protected by law. An applicant who believes this policy is not being followed should contact in writing the Manager, EEO Compliance, Diversity & Inclusion at The Port Authority and NY & NJ, 225 Park Avenue South, 10th Floor, New York, NY 1003.

(ECF No. 56-1 ¶ 52 and ECF No. 90-2 ¶ 52.)

On August 2, 2013, Plaintiff was notified of her acceptance to the 112th Port Authority Academy Class. (ECF No. 56-1 ¶ 53 and ECF No. 90-2 ¶ 53.) The letter indicated that "during this program, [all candidates] must successfully meet all academic, physical performance, attendance and other standards of the Port Authority Police Academy to be appointed as a Police Officer." (ECF No. 56-1 ¶ 55 and ECF No. 90-2 ¶ 55.) Plaintiff also received a letter outlining the requirements of recruits and the expectations of the Academy, which stated:

> Your appointment as a Probationary Port Authority Police Officer is contingent upon an acceptable background investigation and

> successful completion of the Police Academy Basic Course. These
> are **the conditions of your employment** and failure to meet these
> conditions **WILL** result in a recommendation for termination from
> the Police Academy.

(ECF No. 56-1 ¶ 57 and ECF No. 90-2 ¶ 57.) On August 16, 2013, Plaintiff was hired as a police

recruit and started training on August 19, 2013, as a member of the 112th recruit class. (ECF No.

56-1 ¶ 9 and ECF No. 90-3 ¶ 2.) Plaintiff's training at the Academy was to last twenty-one weeks

from August 19, 2013, through January 10, 2014. (ECF No. 90-3 ¶ 11 and ECF No. 91-8 ¶ 11.)

The 112th recruit class consisted of approximately 200 recruits, divided into two platoons,

Alpha and Bravo. (ECF No. 90-3 ¶ 8 and ECF No. 91-8 ¶ 8.) Each platoon consisted of

approximately five or six squads, which are identified by number. (ECF No. 90-3 ¶ 8 and ECF No.

91-8 ¶ 8.) Originally, Plaintiff was assigned to Alpha 3, and then switched to Bravo 3. (ECF No.

90-3 ¶ 8 and ECF No. 91-8 ¶ 8.)

**B. The Port Authority's Rules, Regulations, Ethical Standards, and Harassment Policies**

On August 16, 2013, Plaintiff attended an orientation session at the Academy. (ECF No.

90-2 ¶ 59.) At the orientation, Plaintiff received various written materials, such as the General

Rules and Regulations for All Port Authority Employees; Port Authority Publication, Serving in

the Public Interest: The Guide to Port Authority Ethical Standards; Equal Employment Guide for

all Port Authority/PATH Employees; BLR Pocket Guide: Preventing Sexual Harassment and

Other Forms of Discrimination; Port Authority Diversity Police Statement; Port Authority Policy

on Sexual Harassment; Port Authority Equal Employment Opportunity Policy; Port Authority

Human Rights Policy; and Port Authority Disability Policy. (ECF No. 56-1 ¶ 60 and ECF No. 90-

2 ¶ 60.)

Plaintiff admits she signed an acknowledgment receipt stating she received the Port Authority Equal Employment Opportunity Policy, Policy on Sexual Harassment and Diversity Policy Statement, which read as follows:

> I acknowledge that I received the Port Authority of NY & NJ/Port Authority Trans-Hudson Corporation Equal Employment Opportunity Policy dated May 15, 2009, Policy on Sexual Harassment dated May 15, 2009, and Diversity Policy Statement dated May 15, 2009. I understand it is my responsibility to read and to understand the Policies and to conduct myself in accordance with them. Should I have any questions about the Policies I understand that I may contact Stephanie Leis-Desiree, Manager, Officer of EEO Compliance and Diversity Programs at (212) 435-2845 and/or Wayne Turner, EEO Specialist at (212) 435-2894.

(ECF No. 56-1 ¶ 64 and ECF No. 90-2 ¶ 64.)

The Policy on Sexual Harassment Discrimination & Retaliation (Title VII) ("Sexual Harassment Policy") states: "The Port Authority of New York and New Jersey . . . [has] a long-standing commitment to equal employment opportunity, which includes the absolute prohibition of any and all acts of discrimination, harassment, and/or retaliation on the part of its employees on the basis of [] sex . . . ." (ECF No. 56-18 at 1 and ECF No. 90-3 ¶ 12.) The policy lists, in part, the following as examples of prohibited conduct:

> Sexually oriented statements, including sexually offensive comments; repeated sexual jokes and innuendoes; unwanted flirtations, advances or propositions; verbal abuse of a sexual nature; graphic, verbal commentary about an individual's body, sexual prowess or sexual deficiencies; suggestive, insulting, obscene or demeaning comments or gestures; or visual and/or audio presentation of sexual pictures or sexually-related material in the workplace or in a work-related context, including the use of Port Authority authorized telephone lines, computers, mobile devices, internet accounts, or other technologies including personal devices for such purposes.

(ECF No. 56-18 at 2 and ECF No. 90-3 ¶ 13.) Although all employees have an obligation to refrain from engaging in acts of sexual harassment, supervisory, management, and senior staff members

must interact with others and monitor the work environment to prevent sexual harassment discrimination and/or retaliation and take steps to respond to incidents. (ECF No. 56-18 at 2 and ECF No. 90-3 ¶ 14.)

The Equal Employment Opportunity Policy ("EEO Policy") states the "Port Authority has maintained a long-standing commitment to equal employment opportunity for all employees and applicants for employment." (ECF No. 90-3 ¶ 12 and EEO Policy (ECF No. 56-16) at 1.) Managers and supervisors are responsible for ensuring the effectiveness of this policy. (ECF No. 90-3 ¶ 17 and ECF No. 56-16 at 3.) Complaints made pursuant to this policy need not be made in writing. (ECF No. 90-3 ¶ 18 and ECF No. 91-8 ¶ 18.) All complaints regarding violations of this policy should be made to the Manager of the Port Authority's Office of EEO Compliance Diversity and Inclusion in the Human Resources Department. (ECF No. 56-16 at 2.) "Further, each Department has designated a Department and/or Facility Employee Complaint Representative to provide an additional resource for employees to pursue concerning these highly sensitive issues." (*Id.*) One may also choose to discuss his/her concerns with his/her supervisor or manager or directly to higher levels of authority within her department or the organization. (*Id.*) "Each complaint will be reviewed and a prompt, thorough and objective investigation will take place." (*Id.*) The Port Authority also provided all recruits with a "BLR Pocket Guide" for "Preventing Sexual Harassment and Other Forms of Discrimination." (BLR Pocket Guide (ECF No. 56-14).)

### C. The Guidebook and Police Training

On August 19, 2013, Plaintiff received a copy of "The Port Authority of NY & NJ Police Academy Recruit Guidebook 2013" (the "Guidebook"). (ECF No. 56-1 ¶ 66; ECF No. 90-2 ¶ 66; The Guidebook (ECF No. 56-21).) Plaintiff admits she is familiar with the contents of the Guidebook. (ECF No. 90-2 ¶ 68.)

Port Authority recruits "serve under a probationary status and will not be classified as permanent employees until they have successfully completed twelve (12) months of service as a Probationary Police Officer following their graduation from the Port Authority Policy Academy." (ECF No. 56-21 at 51.) Therefore, before becoming sworn police officers, recruits must attend the Port Authority Police Academy and pass all necessary qualifications. (ECF No. 56-1 ¶ 19 and ECF No. 90-2 ¶ 19.) "If a Recruit['s] . . . conduct, performance of duty, physical standards, sick and/or absence record or academic/performance ratings fail to meet or achieve a satisfactory standard at any time during his/her probationary period, his/her employment may be subject to termination by the Superintendent of Police/Director of Public Safety." (ECF No. 56-21 at 51.) Recruits are required to comply with the Port Authority Rules and Regulations, the Police Division Instructions, the Police Operations Instructions, Interim Orders, General Orders, Operations Orders, Written Directives and the Police Academy Rules and Regulations. (*Id.*) "Any Recruit that fails to comply with any rule, regulation, or instruction while at the Port Authority Police Academy will be subject to disciplinary action and/or termination." (*Id.*)

Successful completion of the Academy requires each recruit to achieve a score of 70% in each of the following categories: (1) academics (50%); (2) performance skills (40%); (3) supervisory evaluations (10%); and (4) discipline and attitude. (*Id.* at 24.) This curriculum is a "**Condition of Employment**." (*Id.*) If "a Recruit fails to achieve and maintain the required level of proficiency in the above stated categories, the Recruit Evaluation Board will submit a recommendation to the Superintendent of Police/Director of Public Safety for termination from the program." (*Id.*)

If a recruit fails a written test or is incapable of achieving an acceptable level of proficiency on a performance test, the commanding Officer of the Police Academy or his/her designee will:

- Meet with the Recruit and inform the Recruit of the failure;
- Review the test results with the Recruit and identify the cause(s) for the failure;
- Recommend ways to correct the performance and schedule a re-test with at least one full day for further study permitted;
- Prepare a written report summarizing the meeting, including his/her signature, the date, time, and location. The Recruit must also sign this report. If a designee meets with a Recruit, all written records will be forwarded to the Commanding Officer of the Police Academy.

(*Id.* at 25-26.) Further, a recruit is required to appear before the Recruit Evaluation Board if she:

(1) fails two or more quizzes; (2) fails a test; (3) fails a re-test; (4) violates the Police Academy

Rules and Regulations; and (5) performs below standards in any area of a recruit's skills training.

(*Id.* at 28.) The Recruit Evaluation Board consists of the Commanding Officer of the Police

Academy, the Lieutenant of the Police Academy and the Recruit Coordinator. (*Id.*) If one of those

individuals are unavailable, a Sergeant will serve as an alternate. (*Id.*) The Guidebook further

states:

> 3. Based on the evaluation of a Recruit's performance, the Recruit Evaluation Board will make specific oral and written recommendations to the Recruit. These recommendations are designed to assist the Recruit in his/her efforts to improve his/her performance and may include a prescribed course of remediation. The Board may also place the Recruit on academic probation for a period of time during which his/her performance will be closely monitored for improvement.
>
> 4. If a Recruit on probation fails to show signs of improvement in the areas defined under the Police Academy Training Standards or those set by the Board, the Recruit Evaluation Board will submit to the Superintendent of Police/Director of Public Safety a recommendation for termination from the program.
>
> 5. On the recommendation of either the Commanding Officer of the Police Academy or the Recruit Evaluation Board, with the concurrence of the Superintendent of Police/Director of Public Safety, the Police Academy may terminate a Recruit's employment for failure to meet any Training Standards or for violating the Rules and Regulations. If termination is the recommendation of the

Recruit Evaluation Board, the board will submit to the Superintendent of Police/Director of Public Safety a comprehensive written report of its findings and include therein a description of the efforts undertaken by the Police Academy to improve performance through remediation and counseling.

(*Id.*)

To successfully complete the Firearms test, a recruit must pass both a daylight and diminished light course:

**Daylight Course**
To achieve a passing score of 80%, the participant, in three (3) consecutive firings of the Handgun Qualification Course must place a minimum of 144 shots within the border of the "Q" target silhouettes. If failure occurs, remediation then takes place. To achieve a passing score of 80% after an initial failure and remediation, the participant, in three (3) additional consecutive firings, must place a minimum of 144 shots within the border of the "Q" Target silhouettes.

A Recruit who fails to achieve an average **score of 80%** or higher for record, after three consecutive firings of the Handgun Qualification Course, shall receive additional training. This remedial training must be given before the Recruit is again allowed to attempt qualification. The time allocated and the method of remedial instruction shall be determined by the Range Master. The remediation record runs may not be fired on the same day as the initial record runs. The three remediation record runs scores shall be three separate scores with no influence on the initial record run scores.

Remediation Ammunition (Handgun Qualification Course)
• A maximum of 300 additional rounds may be expended
• Of these additional rounds, 180 rounds are reserved for the second attempt at qualification
• The remaining 120 rounds are to be used for Remedial Training Exercises

**Diminished Light Course**
To achieve a passing score of 80%, the participant, in one (1) firing of the Handgun Diminished Light Qualification Course must place a minimum of 32 shots within the border of the "Q" target silhouette. If a failure occurs, remediation then takes place.

> A trainee who fails to achieve a **score of 80%** or higher for record, after one firing of the Handgun Night Qualification Course, shall receive additional training. This remedial training must be provided before the trainee is again allowed to re-attempt qualification. The time allocated and the method of remedial instruction shall be determined by the Range Master.
>
> Remediation Ammunition (Handgun Diminished Light Qualification Course)
>
> • A maximum of 150 additional rounds may be expended
> • Of these additional rounds, 80 rounds are reserved for a second and third attempt at qualification
> • The remaining 70 rounds are to be used for Remedial Training Exercises
>
> A Recruit who fails to achieve the minimum passing standard for the service pistol requirement, will appear before the Recruit Evaluation Board who will submit a recommendation to the Superintendent of Police/Director of Public Safety for termination from the program. At his/her sole discretion, the Superintendent of Police may grant up to two additional attempts at qualification after reviewing the Recruit's Academy record and the recommendation from the Recruit Evaluation Board.

(*Id.* at 46-47.) To successfully complete the Oleoresin Capsicum Spray ("OC Spray") Course, each recruit is required to pass a written test, properly demonstrate the lawful use of the OC Spray, and be sprayed with the OC Spray by Academy staff in a controlled setting. (*Id.* at 43.)

### D. Plaintiff's Firearms Training

Plaintiff began firearms training on November 1, 2013. (ECF No. 90-3 ¶ 43 and ECF No. 91-8 ¶ 43.) Sergeant Howard presided as Range Master for all of Plaintiff's qualifying firearm examinations. (ECF No. 56-1 ¶ 80 and ECF No. 90-2 ¶ 80.) On November 8, 2013, Plaintiff took and failed both the Daylight Pistol Qualification Course and the Diminished Pistol Light Qualification. (ECF No. 56-1 ¶ 81 and ECF No. 90-2 ¶ 81.) "After qualification, Plaintiff's squad was told their scores by a Sergeant who called each individual to the front of the classroom." (ECF No. 90-3 ¶ 52.) Plaintiff alleges that while she was notified she failed, she was not shown her

targets. (*Id.*) Plaintiff was also notified of her failures via a memorandum, which Plaintiff signed. (ECF No. 56-1 ¶ 84 and ECF No. 90-3 ¶ 53.)

On November 15, 23, and 30, 2015, Plaintiff made her second, third, and fourth attempts, respectively, at qualifying for the Daylight Pistol Qualification Course. (ECF No. 56-1 ¶¶ 85-90 and ECF No. 90-3 ¶¶ 54, 56, 59.) Plaintiff failed all three attempts and signed memoranda acknowledging such. (ECF No. 56-1 ¶¶ 85-90 and ECF No. 90-3 ¶¶ 54, 56, 59.) Again, Plaintiff alleges that while she was notified she failed, she was not shown her targets. (ECF No. 90-3 ¶¶ 54, 56, 59.) As a result of all her qualification failures, Plaintiff attended several remediation training sessions at the Daylight Pistol Qualification Course on November 12, 13, 14, 16, 19, 20, 21, 26, and 27, 2013. (ECF No. 56-1 ¶¶ 91-102 and ECF No. 90-2 ¶¶ 92-102.) In addition to remediation training, Plaintiff was afforded the opportunity to attend voluntary remediation on three dates during the initial firearms training week. (ECF No. 56-1 ¶ 103 and ECF No. 90-2 ¶ 103.) However, Plaintiff admits she did not attend these sessions. (ECF No. 56-1 ¶ 103 and ECF No. 90-2 ¶ 103.) Generally, Plaintiff complains about the firearms training provided by the Port Authority and alleges it was not done in accordance with the procedures set forth in the Guidebook. (*See* ECF No. 90-3 ¶¶ 43-61.) Further, although she admits she received remedial training after failing her examinations, she alleges that training was also conducted improperly because it did not involve any one-on-one instruction or any explanation of what she did incorrectly during her exam. (*See id.*)

### E. Plaintiff's OC Spray Training

Plaintiff claims she was treated differently than other recruits during OC Spray training, which took place on October 4, 2013. (Pl.'s Dep. (ECF No. 56-4) at 157.) Plaintiff alleges before her squad began the physical portion of the OC spray training, Officer Josh Oliveri stated,

"Everyone will live except [Plaintiff]; [Plaintiff] will die." (*Id.* at 157:18-158:3.) During OC spray training, Plaintiff observed the recruits who went before her were sprayed by one instructor in a straight line across their eyes. (*Id.* at 163:15-16.) Prior to it being her turn to get sprayed, Plaintiff alleges Sergeant Torres, an instructor at the Academy (*see* Sergeant Torres's Dep. (ECF No. 56-5) at 18-20), approached her and moved her to the front of the line (ECF No. 56-4 at 167:4-13). Plaintiff contends, unlike the other recruits, she was sprayed by multiple people "because it wasn't across [her] eyes, it was in [her] ears, down [her] arms, [her] neck, [her] chest and [her] hair." (*Id.* at 174:1-6.) Sergeant Torres did not recall moving her to the front of the line or ever spraying her with OC. (*See* ECF No. 56-5 at 135-136.)

### F.  Alleged Discriminatory and Harassing Comments

Plaintiff contends she was harassed and discriminated against during her training at the Academy. Specifically, Plaintiff alleges Academy instructors asked if she was married or had children. (ECF No. 56-4 at 148-149.) She asserts she was questioned by Sergeant Torres in front of her entire platoon about her prior experience as a social worker, while no other recruit was ever questioned in such a manner. (*Id.* at 146-147.) Sergeant Torres also allegedly made a comment that Plaintiff "must have worked in white collar crime because [she] couldn't handle criminals." (*Id.* at 147:25-148:3.) Sergeant Torres denies ever asking Plaintiff what her employment was before the academy or making any such comments. (*See* ECF No. 56-5 at 120.) Plaintiff also contends Sergeant Torres often referred to her as an "American Girl Doll" and a "Barbie Doll." (ECF No. 56-4 at 133:6-8.) Sergeant Torres contests ever calling Plaintiff such names. (ECF No. 56-5 at 118.) Plaintiff further alleges Sergeant Torres told her "he does a lot of funerals for fallen cops and he never looks at their faces, but for [her], when [she's] in [her] casket, he's going to make sure [she] look[s] pretty for [her] family." (ECF No. 56-4 at 140:8-12.) She further alleges

Sergeant Torres stated he was going to harass her until she got her gun, and then would leave her alone "because he doesn't wear his vest as often as he should." (*Id.* at 140:17-25.) Sergeant Torres denies ever making such statements. (ECF No. 56-5 at 120:3-13, 160:14-21.) Plaintiff further contends Sergeant Torres singled her out by requiring her to do squat thrusts[1] on stage in front of her entire platoon. (ECF No. 56-4 at 143:21—144:4.) Sergeant Torres denies ever asking Plaintiff to perform squat thrusts. (ECF No. 56-5 at 69:15-22.)

Plaintiff further alleges she was sexually harassed based on her breast size. She asserts Lisa Orlando, an Academy instructor, went into the women's locker room and told all female recruits to wear sports bras "because the guys were noticing." (ECF No. 56-4 at 186:8.) Plaintiff alleges the comment was directed at her because it was made while Lisa Orlando was looking at her and because she was the only recruit with a sizeable chest. (*Id.*) Plaintiff further contends that on November 25, 2013, when she was leaving the auditorium to go for a run, Sergeant Torres whispered in Sergeant Lubek's ear, and then Sergeant Lubek reminded the females not to forget their sports bras. (*Id.* at 184:9-17.) Sergeant Lubek is a female officer. (*Id.* at 184:22-23.) Sergeant Torres denies ever looking at Plaintiff's breasts. (ECF No. 56-5 at 163:17-23.)

Plaintiff claims she "was made to endure sexually explicit discussions in an attempt to make her uncomfortable." (ECF No. 90-3 ¶ 31.) Instructors Susan Diaz and Triantafillos Lekkas allegedly instructed her to look up the meaning of a "happy ending" massage. (ECF. No 56-4 at 181:20-183:9.)

---

[1] A squat thrust is an exercise where one stands "in an upright position and [goes] down to a pushup position and back up to a standing position." (ECF No. 56-5 at 69:6-8.)

### G. Plaintiff's Complaints

Prior to her termination, Plaintiff did not file any formal or informal complaints with the Port Authority about her treatment in the Academy. (*Id.* at 22:15-18, 136:10-15, 160:8-11.) However, she alleges instructors witnessed the discrimination and harassment and were aware that it was ongoing. (*Id.* at 136:14-15.) Nevertheless, Plaintiff states she reported the discrimination and harassment to her fellow recruits. (*Id.*)

### H. Plaintiff's Termination

On December 2, 2013, Plaintiff attended a meeting with Chief Brown, the Chief of Police in the Port Authority Public Safety Department,[2] Lieutenant Adorno, Sergeant Torres, and Sergeant Frank D'Alessandro in the boardroom, where she was advised she failed the firearms course and given the opportunity to resign or be terminated from the Academy. (ECF No. 56-4 at 192:8-193:3.) Plaintiff decided not to resign. (*Id.* at 192:13.) As a result, Chief Brown recommended that Plaintiff be terminated from the Academy. (ECF No. 56-8 at 69:1-3.) Nevertheless, Superintendent Fedorko, who has been the superintendent of Police and the Director of the Public Safety Department at the Port Authority since 2009 and who has final approval for termination of a recruit, may provide a recruit with another chance for qualification, even after a recruit has exhausted all her opportunities. (*Id.* at 69:20-70:2; ECF No. 56-1 ¶ 11; ECF No. 90-2 ¶ 11; ECF No. 90-3 ¶ 6; and ECF No. 91-8 ¶ 6.) Chief Brown alleges Plaintiff was provided with these additional opportunities to pass but failed. (ECF No. 56-8 at 70:1-2.) Plaintiff does not contest she was afforded additional attempts, but alleges she was never notified those opportunities

---

[2] Chief Brown controls the day-to-day operations at the academy and oversees all training programs. (Chief Brown Dep. (ECF No. 56-8) at 86:12-25.)

were her last attempts. (ECF No. 90-3 ¶ 69.) She further contends numerous male recruits received memoranda indicating that Superintendent Fedorko granted them two additional attempts to qualify, whereas she never received notice that she would only be afforded two more opportunities. (*Id.* and ECF No. 90-8 at 52-58.) On December 4, 2013, Plaintiff attended a "supervisors meeting" and was terminated. (ECF No. 90-3 ¶ 71 and ECF No. 91-8 ¶ 71.)

## I. Procedural History

On January 31, 2014, Plaintiff filed a Notice of Claim against the Port Authoirty. (ECF No. 90-8 at 95.) On December 3, 2014, Plaintiff filed a Complaint against Defendants alleging: (1) due process and equal protection violations; (2) first amendment violations; (3) civil conspiracy violations under 42 U.S.C. §§ 1985 and 1986; (4) common law civil conspiracy violations; (5) wrongful termination against public policy; (6) intentional infliction of emotional distress; and (7) assault and battery. (*See* Compl. (ECF No. 1).) On January 27, 2017, Defendants filed a Motion for Summary Judgment. (ECF No. 56.) Plaintiff filed her opposition on May 24, 2017. (ECF No. 90.)[3]

---

[3] Defendants' motion's return date was initially scheduled for February 21, 2017. However, Plaintiff filed several requests to adjourn the motion date and extend the briefing schedule. (*See* ECF Nos. 59, 61, 63, 67.) The Court granted all motions to adjourn and extend the briefing schedule. (*See* ECF Nos. 62, 64, 69.) On March 13, 2017, in addition to requesting another extension, Plaintiff requested permission to file an over-length brief up to 70 pages. (ECF No. 63.) On March 15, 2017, the Court granted Plaintiff's request for an extension, but denied Plaintiff's request to exceed the 40-page limit. (ECF No. 64.) On March 24, 2017, while adjourning the deadlines as to the Motion for Summary Judgment, the Court also ordered the parties to submit a joint proposed briefing schedule. (ECF No. 69.) On March 27, 2017, the parties submitted a briefing schedule, where Plaintiff's opposition was due on April 10 and Defendants' reply on April 28, 2017. (ECF No. 70.) On April 10, 2017, Plaintiff timely submitted her opposition, however, the brief exceeded the page limit and deliberately ignored the Court's previous order denying her request to exceed the 40-page limit. (ECF No. 72.) Defendants objected to Plaintiff's over-length brief and asked the Court to reject the brief. (ECF No. 75.) On April 17, 2017, the Court again denied Plaintiff's request to file an over-length brief and rejected Plaintiff's opposition for failing to comply with this Court's prior order and ordered Plaintiff to file an amended opposition by April 19, 2017. (ECF No. 76.) On April 19, 2017, plaintiff refiled her brief and it complied with

## II.  LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331. On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary

---

the 40-page limit, but Plaintiff filed a Supplemental Statement of Disputed Material Facts (ECF No. 77-4), which was not included as part of her original opposition papers filed on April 10, 2017. (ECF No. 77.) On May 10, 2017, the Court ordered Plaintiff's opposition to be stricken from the record and required her to file an opposition by May 24, 2017. (ECF No. 87.)

judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## III. DECISION

### A. Due Process and Equal Protection Claims Against the Port Authority Pursuant to 42 U.S.C. § 1983 (Count I)

#### 1. Section 1983 Generally

Plaintiff's Complaint asserts the Port Authority is liable for its officers' alleged due process and equal protection violations because "the custom, policy, and practice of the employer caused Plaintiff to be harmed." (ECF No. 1 ¶ 51.) Specifically, Plaintiff argues the Port Authority has a "well-established custom, policy and practice of condoning harassment and retaliating against employees who expose misconduct." (ECF No. 90 at 39.) She alleges the policy at the Academy was that "snitches get stitches and wind up in ditches." (*Id.*) Defendants argue "[t]he Port Authority cannot be held liable under a theory of *respondeat superior* because it does not have a well-established policy or custom that proximately caused any alleged constitutional violation." (Defs.' Br. (ECF No. 56-44) at 26.) In response, Plaintiff argues "the Academy has a well-established custom, policy and practice of condoning harassment and retaliating against employees who expose misconduct." (ECF No. 90 at 39.)

Plaintiff's claims against the Port Authority arise under 42 U.S.C. § 1983, which creates a private cause of action for a violation of an individual's constitutional rights by a person acting under color of state law. Section 1983 of Title 42 of the United States Code provides a cause of action for an individual whose constitutional or federal rights are violated by those acting under color of state law:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

"To establish valid claims under § 1983, the plaintiff must demonstrate that the defendants, while acting under color of state law, deprived him of a right secured by the Constitution or the laws of the United States." *Shuman ex rel Shertzer v. Penn Manor School Dist.*, 422 F.3d 141, 146 (3d Cir. 2005) (citing *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995) (citing *Moore v. Tartler*, 986 F.2d 682, 685 (3d Cir. 1993))); *see also Gomez v. Toledo*, 446 U.S. 635, 640 (1980) ("By the plain terms of § 1983, two—and only two—allegations are required in order to state a cause of action under that statute. First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law."). A municipal or local governmental entity such as the Port Authority is considered a "person" within the meaning of 42 U.S.C. 1983. *See Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 53 (1994); *Pratt v. Port Auth. of N.Y. & NJ*, 11-4880, 2013 WL 2181286, at *3 (D.N.J. May 20, 2013), *aff'd in part, vacated in part sub nom on other grounds*, 563 F. App'x 132 (3d Cir. 2014).

"The Supreme Court enunciated the rule for imposing liability against a municipality [or local government] under section 1983 in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978)." *Kneipp v. Tedder*, 95 F.3d 1199, 1211 (3d Cir. 1996). Pursuant to 42 U.S.C. § 1983, governmental entities cannot be liable for the actions of its employees on a *respondeat superior* theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). The Court in *Monell* held:

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* at 694.

"A governmental agency such as the Port Authority 'may be liable under section 1983 only if it can be shown that its employees violated a plaintiff's civil rights as a result of a municipal policy or practice.'" *Pratt*, 2013 WL 2181286, at *3; *see Otero v. Port Auth. of N.Y. & N.J.*, 14-1655, 2016 WL 1260682, at *6 (D.N.J. Mar. 31, 2016); *Maresca v. Port Auth. of N.Y. & N.J.*, 10-1055, 2012 WL 6728560, at *11 n. 9 (D.N.J. Dec. 27, 2012); *Makboul v. Port Auth. of N.Y. & N.J.*, 09-3540, 2011 WL 4594224, at *8 (D.N.J. Sept. 29, 2011).

 "Policy is made when a decision [] maker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Benjamin v. E. Orange Police Dep't*, 937 F. Supp. 2d 582, 595 (D.N.J. 2013) (quoting *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990) (citation omitted)). "A course of conduct is considered to be a custom when, though not authorized by law, such practices of state officials [are] so permanent and well settled as to virtually constitute law." *Id.* (quoting *Andrews*, 895 F.2d at 1480 (citation omitted)). Custom can also be established through evidence of "knowledge and acquiescence." *Id.*

Therefore, in order for Plaintiff to defeat this summary judgment motion, not only must she demonstrate there are genuine issues of material fact as to her due process and equal protection claims, but that there are genuine issues of material fact as to whether the Port Authority had a policy or custom that violated her constitutional rights. The Court will therefore analyze the merits of the claims below, as well as qualified immunity as needed.

### 2. Equal Protection from Discrimination

Defendants argue Plaintiff cannot "make out a prima facie case of discrimination because she was not qualified for and her termination from the Academy did not occur under circumstances raising an inference of gender discrimination." (ECF No. 56-44 at 5.) Defendants further argue

"Plaintiff was terminated because she failed her firearms qualification – an essential job function of a police officer." (*Id.*) Plaintiff argues she possessed the qualifications necessary at the time of her hire and that Defendants' proffered reason for her termination was a pretext for discrimination. (*See* ECF No. 90 at 3-10.)

The same standard applies to equal-protection claims under § 1983 and Title VII claims. *Wood v. University of Pittsburgh*, 395 F. App'x 810, 816 (3d Cir. 2010). *Holt v. Pennsylvania*, 683 F. App'x 151, 160 (3d Cir. 2017) ("And because of the overlap between Title VII claims and constitutional discrimination claims, we have applied Title VII caselaw to equal protection claims."); *Middleton v. Deblasis*, 844 F. Supp. 2d 556, 565 (E.D. Pa. 2011) ("Equal protection discrimination claims under § 1983 are evaluated under the same framework as Title VII claims.") (citation omitted).

"A Title VII or § 1983 plaintiff may state a claim for discrimination under either the pretext theory set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or the mixed-motive theory set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), under which a plaintiff may show that an employment decision was made based on both legitimate and illegitimate reasons." *Sosa v. Napolitano*, 318 F. App'x 68, 71 (3d Cir. 2009) (quoting *Makky v. Chertoff*, 541 F.3d 205, 213 (3d Cir. 2008)); *see Warenecki v. City of Phila.*, No. Civ. A. 10-1450, 2010 WL 4344558, at *5 (E.D. Pa. Nov. 3, 2010) (applying the *McDonnell Douglas* burdening shifting analysis to both Title VII and § 1983 claims); *Longoria v. New Jersey*, 168 F. Supp. 2d 308, 316 (D.N.J. 2001) (stating the essential *prima facie* elements for discrimination are similar whether in a Title VII or § 1983 context).

Under *McDonnell Douglas*:

> the plaintiff must first establish a prima facie case of discrimination
> by showing that: (1) s/he is a member of a protected class; (2) s/he

> was qualified for the position s/he sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination.

*Id.* If the plaintiff establishes a *prima facie* case of discrimination, "the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Makky*, 541 F.3d at 214. "If the defendant does so, the inference of discrimination drops and the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely pretext for intentional discrimination." *Id.* (citations omitted). "[A] mixed-motive plaintiff may establish an unlawful employment practice by demonstrating 'that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.'" *Sosa*, 318 F. App'x at 72. "In order to establish a prima facie case of discrimination under either theory, a plaintiff must establish that she was qualified for the job she sought to obtain or retain." *Id.* (citing *Makky*, 541 F.3d at 215 ("We hold today that a mixed-motive plaintiff has failed to establish a prima facie case of a Title VII employment discrimination claim if there is unchallenged objective evidence that s/he did not possess the minimal qualifications for the position plaintiff sought to obtain or retain.")).

Here, Plaintiff is not proceeding under a mixed-motived theory and prosecutes her discrimination claim exclusively under the *McDonnell Douglas* framework. (ECF No. 90 at 3.) Therefore, the Court will do the same. Specifically, Plaintiff merely argues she established a *prima facie* case of discrimination, even though she failed the firearms qualification because "the qualifications possessed by an individual at the time of her hire are the applicable objective standards for determining whether she is qualified." (ECF No. 90 at 3 (citing *Geisel v. Primary Health Network*, No. 207-1548, 2010 WL 3719094 (W.D. Pa. Sept. 17, 2010)).) In her briefs, she does not contest that she failed the examination or argue she was unable to pass as a result of

gender discrimination or that this discrimination was hidden by the subjective nature of the firearms examination. (ECF No. 90 at 3-4.) Instead, she argues "Defendants completely controlled her ability to attempt to qualify and deprived her of a full and fair opportunity to do so in violation of the [Port Authority Police Department's ("PAPD")] own policies" because the "training at the Academy was wholly inadequate" and did meet the Port Authority's own requirements. (*Id.* at 4.)

The Court finds *Geisel* does not apply to the facts of this case. In *Geisel*, the court stated:

> Where an employer hires an employee who does not meet the objective job qualifications for a given position, the employer cannot rely on those objective job qualifications to defeat a plaintiff's prima facie case; instead, the qualifications possessed by the individual who was hired become the applicable objective standards. Thus the relevant inquiry is whether the plaintiff was as qualified as the person who ultimately obtained the position.

*Geisel*, 2010 WL 3719094 at 6 (citations omitted). Here, Plaintiff was qualified to be a recruit at the time she was hired, however, she was not qualified for the position she sought to retain or attain, that of an officer, as required by *Makky*, 541 F.3d at 214 ("In order to establish a prima facie case of discrimination . . . , a plaintiff must establish that she was qualified for the job she sought to obtain or retain . . . ."). Indeed, the Third Circuit has found that in order for a Federal Air Marshal Service trainee to establish a *prima facie* case of discrimination, she had to establish that she was qualified for the job she sought to obtain or retain. *Sosa*, 318 F. App'x at 72. Because the Federal Air Marshal Service trainee failed tactics, she was not qualified to retain her positions as a Federal Air Marshal. *Id.* at 72-73. Nonetheless, even applying the *Geisel* test, Plaintiff was not "as qualified" as the recruits who ultimately obtained the officer position because they passed the firearms examination. *Geisel*, 2010 WL 3719094 at 6.

Because the Court finds Plaintiff failed the firearms qualifications examination, she was not "qualified for the position [she] sought to attain or retain." *Makky*, 541 F.3d at 214. While at

oral argument Plaintiff seemed to suggest that she was contesting her failure of the firearms examination because she was not shown targets, the record demonstrates Plaintiff failed all firearms attempts and signed a memoranda acknowledging such. (Oral Arg. Tr. (ECF No. 93) at 9 ("She did not qualify, that is correct. According to them, when they showed her – she never saw the targets after she shot."); ECF No. 56-1 ¶¶ 85-90; and ECF No. 90-3 ¶¶ 54, 56, 59.) If Plaintiff disputed her failures, as she now contends, she could and in fact should have requested to see her targets prior to signing the memoranda or refused to sign the memoranda. Plaintiff does not dispute that she voluntarily signed the memoranda, acknowledging her failures of the firearms examinations, and does not allege fraud with respect to the results. Therefore, Plaintiff has no basis to dispute her results, and indeed, the record before the Court demonstrates she knew she failed.

Further, even if the Court finds the Defendants did not follow their policies in showing all recruits their targets after they took the firearms examination and that the Academy training was inadequate, all recruits went through the same inadequate training and some managed to pass. The Court notes Plaintiff alleges male recruits, who also initially failed the firearms examination, received memoranda indicating they were granted two more additional attempts, whereas she never received notice that she would only be afforded two more opportunities to pass the firearms examinations. (ECF No. 90-3 ¶ 69; ECF No. 90-8 at 52-58; and ECF No. 90 at 8.) Significantly, Plaintiff does not allege she was not provided the same opportunities to pass as the male recruits; only that she was treated differently than male recruits because she did not receive a notice they received. However, Plaintiff does not explain how her lack of notice affected her chances of passing the firearms examination. Other than arguing that male recruits received a notice she did not, she does not argue any other gender discrimination caused her to fail the firearms exam. Lastly, Plaintiff fails to provide evidence demonstrating that recruits who failed the examination

and failed the additional attempts were not terminated. Accordingly, Plaintiff has not pointed to any evidence demonstrating her failure was due to gender discrimination. Therefore, Plaintiff failed to establish a *prima facie* case of gender discrimination and this Court need not reach whether the Port Authority's proffered reason for terminating her was pretextual or whether the Port Authority was entitled to qualified immunity.

### 3. Procedural Due Process Pursuant to 42 U.S.C. § 1983

Defendants argue Plaintiff received all rights afforded to her under the Guidebook and that no constitutional due process claim lies against them. (ECF No. 56-44 at 8.) They further argue "Plaintiff's procedural due process claim also fails because, as a probationary police officer, she had no property interest in her unilateral expectation of continued employment." (*Id.*) Lastly, they contend she "has no claim under the due process clause for alleged stigma or damage to her reputation." (*Id.* at 9.) Plaintiff argues she "possessed a property interest based on the express language of the Guidebook" and that she can establish a liberty interest (ECF No. 90 at 11, 13-14.) Plaintiff further claims the Port Authority did not afforded her all hearings, meetings, or reviews in accordance with the Guidebook and established procedures. (*Id.* at 14-15.)

The Fourteenth Amendment of the Constitution prohibits "a state from depriving persons of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. "When a plaintiff sues under 42 U.S.C. § 1983 for a state actor's failure to provide procedural due process" she must demonstrate she had a life, liberty, or property interest *and* that the procedures available to her did not provide her with "due process of law." *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000) (emphasis added).

Regardless of whether or not Plaintiff had a liberty or property interest, the Court finds Plaintiff was afforded all her due process rights prior to her termination. "An essential principal of

due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)). "This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Id.* (citations omitted.) The Constitution requires the opportunity be "granted at a meaningful time and in a meaningful manner." *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971) (citation omitted).

Here, it is uncontested that on December 2, 2013, Plaintiff attended a meeting with Chief Brown, Lieutenant Adorno, Sergeant Torres, and Sergeant D'Alessandro in the boardroom, where she was advised she failed the firearms course and given the opportunity to resign or be terminated from the Academy. (ECF No. 56-4 at 192:8-193:3.) Plaintiff was also afforded the opportunity to make a phone call prior to making her decision. (*Id.* at 192:11-12.) She called her father, who told her the meeting was part of a "scare tactic" and "not to quit." (*Id.* at 192:19-23.) While Plaintiff argues she was never allowed to review her shooting results or targets, provided recommendations on how to better her shooting, or provided a written report summarizing her meeting, she had an opportunity to be heard on December 2, prior to being termination. (ECF No. 90 at 15.) Plaintiff could have asked to review her target scores at the meeting prior to making any decisions. Although the Guidebook provided for more procedural safeguards before termination, due process only mandates "some kind of hearing prior to the discharge of an employee." *Cleveland Bd. of Educ.*, 470 U.S. at 542. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiff's Procedural Due Process Claim.[4]

---

[4] Because the Court finds Plaintiff was afforded due process, it need not determine whether Plaintiff was deprived of a property or liberty interest or whether the Port Authority had qualified immunity. *See Washington v. Hanshaw*, 552 F. App'x 169, 175 (3d Cir. 2014) (concluding that

### 4.  Substantive Due Process Pursuant to 42 U.S.C. § 1983

Defendants' moving papers fail to address Plaintiff's substantive due process claim. (*See* ECF No. 56-44.) Nonetheless, in her opposition, Plaintiff argues the Port Authority's denial of Plaintiff's due process rights was arbitrary and shocks the conscience. (ECF No. 90 at 15.)  In their reply, Defendants respond that Plaintiff's termination was neither arbitrary nor shocked the conscience. (ECF No. 91 at 10-11.)

"To establish a substantive due process claim under § 1983, the plaintiff must prove (1) the particular interest at issue is protected by the Fourteenth Amendment, and (2) the government's deprivation of that protected interest shocks the conscience." *Connection Training Servs. v. City of Phila.*, 358 F. App'x 315, 319 (3d Cir. 2009). "The plaintiff must have been deprived of a fundamental property interest under the Constitution." *Id.* If the plaintiff was deprived of a fundamental property interest, the court must then consider whether the conduct was arbitrary or irrational; "however, if the right is not fundamental, there is no substantive due process issue and the state conduct will be upheld so long as the state complies with procedural due process." *Id.* (citing *Nicolas v. Pa. State Univ.*, 227 F.3d 133, 142 (3d Cir. 2000)).

Courts have recognized two types of substantive due process claims: (1) legislative and (2) non-legislative. *Id.* "[W]hen a plaintiff challenges the validity of a legislative act, substantive due process typically demands that the act be rationally related to some legitimate government

---

because the plaintiff's claims did not make out a constitutional violation, the court did not need to address questions of qualified immunity).

purpose." *Nicolas*, 227 F.3d at 142. However, "when a plaintiff challenges a non-legislative state action (such as an adverse employment decision), we must look, as a threshold matter, to whether the property interest being deprived is 'fundamental' under the Constitution." *Id.* Here, Plaintiff is challenging a non-legislative state action, an adverse employment decision.

Focusing on the nature of the property interest at stake, the Court finds Plaintiff was not deprived of a fundamental property interest. The Third Circuit has held that tenured public employment is not a fundamental interest under the Constitution, and thus a terminated public employee cannot invoke substantive due process principles to challenge that action. *Id.* at 138–43; *see Singleton v. Cecil*, 176 F.3d 419, 425–26 (8th Cir. 1999) (en banc) (holding "a public employee's interest in continued employment with a governmental employer is not so 'fundamental' as to be protected by substantive due process"); *McKinney v. Pate*, 20 F.3d 1550, 1560 (11th Cir. 1994) (en banc) (finding "employment rights are not 'fundamental' rights created by the Constitution"); *Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1350 (6th Cir. 1992) (holding "plaintiffs' state-created right to tenured employment lacks substantive due process protection"); *Huang v. Bd. of Governors of Univ. of N.C.*, 902 F.2d 1134, 1142 n.10 (4th Cir. 1990) (holding the professor's interest in a position in the university department "is essentially a state law contract right, not a fundamental interest embodied in the Constitution"); *Lum v. Jensen*, 876 F.2d 1385, 1389 (9th Cir. 1989) (finding "no clearly established constitutional right to substantive due process protection of continued public employment"). This Court views a recruit's employment as closely analogous to those state-created property interests the above courts have deemed unworthy of substantive due process and need not consider whether Defendants' conduct shocks the conscience. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiff's substantive due process claim and need not address qualified immunity.

### 5. Hostile Work Environment in Violation of Equal Protection Clause

Defendants argue Plaintiff cannot establish a hostile work environment claim against the Port Authority because Plaintiff never reported any of her harassment allegations to the Port Authority in accordance with the policies. (ECF No. 56-44 at 10-12.) Plaintiff argues the Port Authority are not entitled to the *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. Boca Raton,* 524 U.S. 775 (1998) affirmative defense, which provides that a plaintiff who did not report harassment cannot succeed on a hostile work environment claim. (ECF No. 90 at 22-23.) She further argues there is sufficient evidence to establish a hostile work environment claim. (*Id.* at 18-22.)

To establish a hostile work environment claim under § 1983, a plaintiff must prove:

> (1) the employee[] suffered intentional discrimination because of [her] sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability.

*Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293 (3d Cir. 1999) (citing *Andrews*, 895 F.2d at 1482; *see Mobley v. City of Atl. City Police Dep't*, No. 97-2086 (JBS), 2000 WL 363692, at *5 (D.N.J. Mar. 30, 2000) (adopting Title VII's hostile work environment elements to § 1983 claims); *Graham v. Avella Area Sch. Dist.*, No. 02:05CV1344, 2008 WL 203359, at *6 (W.D. Pa. Jan. 24, 2008) (adopting Title VII's hostile work environment elements to § 1983 claims).

As to the first prong, the proper injury at the summary judgment stage is "whether a reasonable factfinder could view the evidence as showing" the plaintiff's treatment "was attributable to her [sex]." *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 277 (3d Cir. 2001). A plaintiff need not "demonstrate direct evidence of her harasser's motivation for discrimination against her." *Id.* at 278. "Similarly, we have never required a plaintiff to

demonstrate direct proof that her harasser's intent was to create a discriminatory environment. Instead, we have held that . . . the intent to discriminate can be inferred." *Id.*; *see Iadimarco v. Runyon*, 190 F.3d 151, 157 (3d Cir. 1999) ("The Supreme Court has recognized that an employer who discriminates will almost never announce a discriminatory animus or provide employees or courts with direct evidence of discriminatory intent."). Regardless of a harasser's intention,

> if a plaintiff presents sufficient evidence to give rise to an inference of discrimination by offering proof that her "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," . . . a hostile work environment claim will survive summary judgment.

*Abramson*, 260 F.3d at 278-79 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)).

In determining whether the fourth prong is met, the court must look at the totality of the circumstances. "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 280. To establish the fifth prong, "liability exists where the defendant knew or should have known of the harassment and failed to take prompt remedial action." *Kunin*, 175 F.3d at 293–94.

The Supreme Court has found that an employer is not subject to vicarious liability for a hostile work environment claim created by a supervisor "[w]hen no tangible employment action is taken" and the employer: (1) "exercised reasonable care to prevent and correct promptly any sexually harassing behavior"; and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Indus., Inc.*, 524 U.S. at 745; *Faragher,* 524 U.S. at 777-78; *see Aguas v. State*, 220 N.J. 494, 499 (2015) (finding the defense only applies when the "employer has not taken

an adverse tangible employment action against the plaintiff employee"). This vicarious liability defense does not apply to this case because the Port Authority terminated Plaintiff.

After a review of the record, the Court finds genuine issues of material fact exist as to whether the Port Authority subjected Plaintiff to a hostile work environment because she was a female. As to the first prong, genuine issues of material fact exist as to whether the Port Authority's motivation for certain comments and questions were based on Plaintiff's sex. Because the record is replete with many alleged incidents of discrimination, the Court will only articulate a few.

Plaintiff alleges she was sexually harassed based on her breast size. She asserts Lisa Orlando, an Academy instructor, went into the women's locker room and told all female recruits to wear sports bras "because the guys were noticing." (ECF No. 56-4 at 186:8.) Plaintiff alleges the comment was directed at her because it was made while Lisa Orlando was looking directly at her and because she was the only recruit with a sizeable chest. (*Id.*) Plaintiff further contends that on November 25, 2013, when she was leaving the auditorium to go for a run, Sergeant Torres whispered in Sergeant Lubek's ear, and then Sergeant Lubek reminded the females not to forget their sports bras. (*Id.* at 184:9-17.) Plaintiff contends she "was made to endure sexually explicit discussions in an attempt to make her uncomfortable." (ECF No. 90-3 ¶ 31.) Instructors Susan Diaz and Triantafillos Lekkas allegedly instructed her to look up the meaning of a "happy ending" massage. (ECF No. 56-4 at 181:20-183:9.) Sergeant Torres denies ever looking at Plaintiff's breasts. (ECF No. 56-5 at 163:17-23.)

Plaintiff also alleges Academy instructors asked if she was married or had children. (*Id.* at 148-149.) In addition, Plaintiff alleges Sergeant Torres made a comment that Plaintiff "must have worked in white collar crime because [she] couldn't handle criminals." (*Id.* at 147:25-148:3.) Plaintiff also contends Sergeant Torres often referred to Plaintiff as "American Girl Doll" and

"Barbie Doll." (*Id.* at 133:6-8.) Sergeant Torres contests ever calling Plaintiff such names. (ECF No. 56-5 at 118.) Plaintiff further alleges Sergeant Torres told her "he does a lot of funerals for fallen cops and he never looks at their faces, but for [her], when [she's] in [her] casket, he's going to make sure [she] look[s] pretty for [her] family." (ECF No. 56-4 at 140:8-12.) Sergeant Torres denies ever making such statements. (ECF No. 56-5 at 120:3-13, 160:14-21.) Plaintiff also contends Sergeant Torres singled her out by requiring her to do squat thrusts on stage in front of her entire platoon. (ECF No. 56-4 at 143:21—144:4.) Sergeant Torres denies ever asking Plaintiff to perform squat thrusts. (ECF No. 56-5 at 69:15-22.) Lastly, Plaintiff alleges after OC Spray training, Sergeant Torres made her stand in front of the entire platoon and show them what she looked like and referred to her as "looking like Angelina Jolie because [her] lips were so swollen." (ECF No. 56-4 at 178:11-179:1.) Sergeant Torres denies all of these allegations, thus creating an issue of fact.

As to the second prong, a reasonable jury could find the discrimination was pervasive and regular. Plaintiff alleges the discrimination occurred throughout her entire time as a trainee, which was from August 19 to December 4, 2013. (ECF No. 56-1 ¶ 9; ECF No. 90-3 ¶¶ 2, 71; ECF No. 91-8 ¶ 71; Certif. of Amanda Holley (ECF No. 90-4) ¶ 6.) There is also a genuine issue of material fact as to prong three, whether the discrimination detrimentally affected Plaintiff. As a result of the alleged harassment, Plaintiff sought treated from a licensed clinical social worker, Toni Nokes. (ECF No. 56-4 at 207.) Plaintiff also underwent a psychiatric evaluation conducted by Daniel Gollin, M.D., which determined Plaintiff suffered from a "severe mental illnesses, and the information pertaining to the circumstances surrounding the onset of the ongoing episode very clearly demonstrate environmental stressors [Plaintiff] was exposed to while attending the police academy that would be expected to produce the illnesses from which [Plaintiff] has been

suffering." (ECF No. 90-8 at 115.) "Most compelling in this regard is the specificity of Post-Traumatic re-experiencing symptoms, which consist of nightmares and intrusive memories of the person whom [Plaintiff] identifies as being the primary perpetrator of abusive treatment while she attended the academy." (*Id.*) As to the fourth prong, the conduct in this case could be said to go beyond teasing and a reasonable jury could find that a reasonable person of the same sex in Plaintiff's position would find the conduct alleged to be harmful and that it altered her working conditions.

Regarding the last factor, the existence of *respondeat superior* liability, as stated above the Port Authority cannot be held liable solely based on a theory of *respondeat superior*. In determining whether an employer is liable for a sexually hostile work environment, liability exists where the defendant "knew or should have known of the harassment and failed to take prompt remedial action." *Kunin*, 175 F.3d at 293–94. Here, although all employees have an obligation to refrain from engaging in acts of sexual harassment, supervisory, management, and senior staff member, they also "have a particular obligation to interact with others and to monitor the work environment to prevent sexual harassment discrimination and/or retaliation and take appropriate steps to promptly respond to incidents which occur." (ECF No. 56-18 at 2 of 3 and ECF No. 90-3 ¶ 14.) Because the alleged harassment continuously occurred during training and supervisors, management, and staff members have an obligation to monitor the environment, there are genuine issues of material fact as to whether the Port Authority and its superiors, such as Chief Brown and Superintendent Fedorko, should have known about the alleged harassment.

Furthermore, the Court finds the Port Authority is not entitled to qualified immunity. There are genuine issues of material fact as to whether the Port Authority had customs that proximately caused the alleged hostile work environment. Plaintiff's deposition alleges that on at least two

separate occasions, during physical training and in the classroom, two officers stated "snitches get stitches and end up in ditches." (ECF No. 56-4 at 188-191.) Furthermore, another officer told Plaintiff to "stop feeling sorry for [herself] and that if she complained, she would end up like Recruit Blackwell."[5] (*Id.* at 137:21-25.) This Court finds there are questions of fact such that a jury could find the Port Authority had a custom of allowing a hostile work environment to thrive through intimidation.

Accordingly, the Court **DENIES** Defendants' Motion for Summary Judgment as to Plaintiff's hostile work environment claim.

### B. Due Process and Equal Protection Claims Against Individual Defendants Pursuant to 42 U.S.C. § 1983 (Count I)

#### 1. Due Process

Plaintiff also brings due process claims against the individual Defendants. (ECF No. 90 at 24-25.) Because the Court found Plaintiff was afforded procedural due process and was not deprived of a fundamental property interest, it also **GRANTS** Defendants' Motion for Summary Judgment as to all due process claims against the individual Defendants for the same reasons.

#### 2. Equal Protection

Plaintiff also brings equal protection claims against the individual Defendants. (ECF No. 90 at 25-26.) Because the Court found Plaintiff was not qualified for the job she sought to retain, it also dismisses the equal protection from discrimination claim as to all individual Defendants. Therefore, the Court need only address Plaintiff's hostile work environment claim against the individual Defendants.

---

[5] Recruit Blackwell was a recruit prior to Plaintiff's class, who complained of harassment and eventually filled out a Recruit Resignation. (ECF No. 90-3).

As to the hostile work environment claim against the individual Defendants, Defendants argue "Plaintiff cannot show that either [Superintendent] Fedorko or Chief Brown personally engaged in any discriminatory conduct against her or that they directed anyone at the Academy to do so. Plaintiff also does not show that either [Superintendent] Fedorko or Chief Brown were aware of an acquiesced in any discriminatory conduct." (ECF No. 56-44 at 14.) Further, they argue "Plaintiff's equal protection claim against [Sergeant] Torres should be dismissed because the alleged isolated comments made by [Sergeant] Torres were not remotely severe or pervasive enough to create an equal protection claim." (*Id.*) Plaintiff argues Chief Brown and Superintendent Fedorko "engaged in discrimination by shirking their responsibility to enforce the PAPD's antidiscrimination policies, train and supervise PAPD employees, and protect Plaintiff from harassment." (ECF No. 90 at 25-26.) She further argues Sergeant Torres's actions were severe and pervasive enough to survive a summary judgment motion. (*Id.* at 26.)

"Police officers, embodying the authority of the state, are liable under § 1983 when they violate someone's constitutional rights, unless they are protected by qualified immunity." *Santini v. Fuentes*, 795 F.3d 410, 416–17 (3d Cir. 2015) (quoting *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007)). "The doctrine of qualified immunity shields government officials who perform discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 417 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The purpose of qualified immunity is to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.'" *Id.*

"In order to establish the liability of an individual supervisory employee for sexual or racial discrimination or harassment under § 1983, there must be some affirmative conduct by the

supervisor that played a role in the discrimination." *Hargrave v. Cty. of Atl.*, 262 F. Supp. 2d 393, 442 (D.N.J. 2003) (citation omitted). "The necessary [degree of personal involvement] can be shown in two ways, either 'through allegations of *personal direction or of actual knowledge and acquiescence*,' or *through proof of direct discrimination [or harassment] by the supervisor*." *Id.* (alterations in original) (emphasis added) (quoting *Andrews*, 895 F.2d at 1478.)

One may also establish individual liability via a supervisor's failure to train. "To establish § 1983 liability for failure to train, a plaintiff must show specific training deficiencies and either (1) a pattern of constitutional violations of which policymaking officials can be charged with knowledge, or (2) that training is obviously necessary to avoid constitutional violations." *Gaymon v. Esposito*, No. 11-4170 JLL, 2012 WL 1068750, at *8 (D.N.J. Mar. 29, 2012) (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

Here, as to the first prong or hostile work environment, a genuine issue of fact exists as to whether Plaintiff was harassed by Defendant Sergeant Torres on the basis of her sex for the same reasons discussed above. *See supra* Part III(A)(5). Plaintiff alleges she was sexually harassed based on her breast size. She contends that on November 25, 2013, when she was leaving the auditorium to go for a run, Sergeant Torres whispered in Sergeant Lubek's ear, and then Sergeant Lubek reminded the females not to forget their sports bras. (ECF No. 56-4 at 184:9-17.) In addition, Plaintiff alleges Sergeant Torres made a comment that Plaintiff "must have worked in white collar crime because [she] couldn't handle criminals." (*Id.* at 147:25-148:3.) Plaintiff also contends Sergeant Torres often referred to Plaintiff as "American Girl Doll" and "Barbie Doll." (*Id.* at 133:6-8.) Sergeant Torres denies ever calling Plaintiff such names. (ECF No. 56-5 at 118.) Plaintiff further alleges Sergeant Torres told her "he does a lot of funerals for fallen cops and he never looks at their faces, but for [her], when [she's] in [her] casket, he's going to make sure [she] look[s]

pretty for [her] family." (ECF No. 56-4 at 140:8-12.) Plaintiff further contends Sergeant Torres singled her out by requiring her to do squat thrusts on stage in front of her entire platoon. (*Id.* at 143:21—144:4.) Lastly, Plaintiff alleges after OC Spray training, Sergeant Torres made her stand in front of the entire platoon and show them what she looked like and referred to her as "looking like Angelina Jolie because [her] lips were so swollen." (*Id.* at 178:11-179:1.)

As to the second prong, plaintiff must show the discrimination was pervasive and regular. Plaintiff alleges the discrimination occurred throughout her entire time as a trainee, which was from August 19 to December 4, 2013. (ECF No. 56-1 ¶ 9; ECF No. 90-3 ¶¶ 2, 71; ECF No. 91-8 ¶ 71; ECF No. 90-4 ¶ 6.) There is also a genuine issue of material fact as to prong three, whether the discrimination detrimentally affected Plaintiff. As a result of the alleged harassment, Plaintiff sought treated from a licensed clinical social worker, Toni Nokes (ECF No. 56-4 at 207) and underwent a psychiatric evaluation conducted by Daniel Gollin, M.D. (ECF No. 90-8 at 115). As to the fourth prong, the conduct in this case could be said to go beyond teasing and a jury could find that a reasonable person of the same sex in Plaintiff's position would find the conduct alleged to be harmful and that it altered her working conditions. Accordingly, the Court **DENIES** Defendants' Motion for Summary Judgment against Sergeant Torres as to the hostile work environment claim.

However, Plaintiff has failed to produce any evidence demonstrating Chief Brown or Superintendent Fedorko directed Sergeant Torres to harass Plaintiff, had actual knowledge the harassment, or directly discriminated against her. *Hargrave*, 262 F. Supp. 2d at 442. Plaintiff merely alleges Chief Brown and Superintendent Fedorko "engaged in discrimination by shirking their responsibility to enforce the PAPD's antidiscrimination policies, train and supervise PAPD employees, and protect Plaintiff from harassment." (ECF No. 90 at 25-26.)

Plaintiff cites to *Cozzo v. Tangipahoa Par. Council-President Gov't*, 262 F.3d 501, 513 (5th Cir. 2001), *opinion withdrawn and superseded sub nom*, 279 F.3d 273 (5th Cir. 2002), for the proposition that "[a]ctual knowledge and acquiescence can include failure to train." (ECF No. 90 at 25.) That case is not binding on this Court. The Third Circuit has yet to establish whether supervisory liability is still applicable to § 1983 claims after *Iqbal*. *See Jankowski v. Lellock*, 649 Fed. Appx. 184, 187 (3d Cir. 2016) ("[W]e have refrained from answering the question of whether *Iqbal* eliminated—or at least narrowed the scope of—supervisory liability because it was ultimately unnecessary to do so in order to dispose of the appeal then before us."); *Harley v. City of N.J. City*, No. 16-5135, 2017 WL 2779466, at *9 (D.N.J. June 27, 2017).

Assuming *Iqbal* did not eliminate the concept of supervisory liability, Plaintiff has failed to produce evidence that Chief Brown or Superintendent Fedorko violated any of Plaintiff's constitutional rights. Plaintiff argues Chief Brown and Superintendent Fedorko did not train Sergeant Torres because he "was not familiar with the BLR Pocket Guide," "he [] attended in-service training which pertained to discrimination and harassment but could not recall when or what it covered," and the totality of what Sergeant Torres took away from his training was "Don't discriminate" and "Don't harass." (ECF No. 90 at 26.) Plaintiff's allegations solely demonstrate Sergeant Torres was trained, but could not remember most of his training. This is not sufficient to implicate supervisory liability. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment as to the hostile work environment claims against Defendants Chief Brown and Superintendent Fedorko.

## C. First Amendment Claim (Count II)

Defendants argue Plaintiff has no First Amendment retaliation claim because she did not engage in protected speech, would have been terminated irrespective of her protected conduct, and because Defendants are entitled to qualified immunity from Plaintiff's First Amendment allegations. (*See* ECF No. 56-44 at 15-19.) Plaintiff contends she engaged in protected speech and that Defendants' reasons for terminating her were merely pretextual. (*See* ECF No. 90 at 31.) Plaintiff Complaint claims she

> made comments to fellow recruits that she was being singled out for disparate treatment and wanted to formally complain about the harassment to which she was being subjected. Upon information and belief, Plaintiff's supervisors learned of her comments and thereafter she was continually intimidated by her supervisors and threatened not to complain in violation of her right of free expression under the First Amendment.

(ECF No. 1 ¶ 54.) In her brief she argues she "engaged in protected speech through her multiple complaints to her Squad Leaders, her voicing of her intention to file suit and the acknowledgment of the harassment by her Academy instructors." (ECF No. 90 at 28.)

A three-step test applies in evaluating a public employee's claim of retaliation for engaging in activity protected pursuant to the First Amendment: (1) "the employee must show that the activity is in fact protected"; (2) "the employee must show that the protected activity was a substantial factor in the alleged retaliatory action"; and (3) "the employer may defeat the employee's claim by demonstrating that the same adverse action would have taken place in the absence of the protected conduct." *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005). A public employee's speech is protected when: "(1) the employee spoke as a citizen; (2) the statement involved a matter of public concern; and (3) the government employer lacked a sufficient reason for treating the employee differently from another member of the general public." *Emigh v. Steffee*,

442 F. App'x 660, 664 (3d Cir. 2011). "Although we have often noted that the first prong of the First Amendment retaliation test presents questions of law for the court while the second and third prongs present questions of fact for the jury, only *genuine* questions of fact should be determined by the jury." *Hill*, 411 F.3d at 127.

Regardless of whether or not Plaintiff engaged in protected speech, Plaintiff has not sufficiently rebutted Defendant's evidence that Plaintiff would have been terminated in the absence of the protected conduct. While Plaintiff argues Defendants' reason for terminating her was merely a pretext because she was harassed, Plaintiff fails to provide evidence demonstrating recruits who failed the firearms examination were not terminated or were provided additional opportunities to pass the examination. (*See* ECF No. 90 at 30-31.) Therefore, the Court finds "the same adverse action would have taken place in the absence of the protected conduct." *Hill*, 411 F.3d at 125. As such, the Court find Defendants did not violate Plaintiff's First Amendment right. Because the Court finds Defendants have not violated her First Amendment rights, it need not discuss qualified immunity. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's First Amendment claim (Count II) as to all Defendants.

### D. Civil Conspiracy Under 42 U.S.C. §§ 1985 & 1986 (Count III)

Defendants argue Plaintiff's civil conspiracy claim should be dismissed because she "failed to produce a scintilla of evidence even suggesting an agreement or plan formulated and executed by Defendants, which rises to the level of a conspiracy." (ECF No. 56-44 at 20.) They further argue her claim fails as a matter of law because Defendants are "agents of a single entity." (*Id.* (citation omitted).) Plaintiff argues the "direct and circumstantial evidence reveals" Defendants conspired to violate Plaintiff's constitutional rights. (ECF No. 90 at 33.) She further argues Defendants are not agents of a single entity. (*Id.* at 34.)

Pursuant to 42 U.S.C. § 1985, a plaintiff can bring an action to recover for injuries incurred by a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). To establish a civil conspiracy claim under § 1985(3), a plaintiff must demonstrate: (i) a conspiracy; (ii) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (iii) an act in furtherance of the conspiracy; and (iv) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States. *See Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006); *Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997).

In this matter, Plaintiff cannot maintain a conspiracy claim against the Defendants because they are considered a single entity that cannot conspire with itself. *See Baldwin v. Gramiccioni*, No. 16-1675 (FLW) (DEA), 2017 WL 120643, at *10 (D.N.J. Jan. 11, 2017) (finding the plaintiff failed to state a claim under § 1985 because the plaintiffs employer, the Monmounth County Prosecutor's Office, and his supervisor were considered a single entity that cannot conspire with itself); *Heffernan v. Hunter*, 189 F.3d 405, 412 n.5 (3d Cir. 1999) (noting the intracorporate conspiracy doctrine, which bars allegations of conspiracy between employees and the same organization, "has also been carried over to alleged conspiracies involving governmental entities"); *see also Suber v. Guinta*, 902 F. Supp. 2d 591, 608 (E.D. Pa. 2012) (stating that "a municipality and its officials are considered a single entity which cannot conspire with itself").

Plaintiff relies on *Novotny v. Great American Federal Savings and Loan Association*, 584 F.2d 1235, 1259 (3d Cir. 1978), *vacated on other grounds*, 442 U.S. 366 (1979), for the proposition that Defendants are not agents of a single entity. However, *Novotny* is inapposite because that case held only that employees of a corporation can conspire with each other for purposes of section

1985(3), not that a corporation can conspire with its officers and employees. *Id.* at 1258; *see*

*Sarteschi v. Pennsylvania*, No. 1:06-CV-2332, 2007 WL 1217858, at *4 (M.D. Pa. Apr. 24, 2007).

In *Novotny*, officers and directors of a corporation allegedly conspired to terminate the

plaintiff's employment in violation of § 1985(3). *Novotny*, 584 F.2d at 1238. The defendants in

*Novotny* argued their alleged concerted action was taken in their official capacities as officers and

directors of the corporation and, therefore, cannot legally be deemed a conspiracy within the terms

of § 1985(3). *Id.* at 1257. However, the Third Circuit rejected the argument stating:

> The defendants place primary reliance on the legal precept that a corporation cannot conspire with its officers because a person cannot conspire with himself. Under this precept, they argue, no conspiracy exists in this case because the defendants were all officers and directors of a single corporation, and the actions injuring Novotny were taken in the course of their duties as such.
>
> As we read Novotny's complaint, however, it does not allege that the corporate entity, GAF, conspired with its officers and directors to his detriment. In defining his cause of action under § 1985(3), Novotny alleges that his termination was accomplished "by the individual defendants in violation of" § 1985(3). *There is thus no occasion to evaluate the force of the proposition that a corporation cannot conspire with itself. Rather, the sole issue before us, so far as the conspiracy element is concerned, is whether concerted action by officers and employees of a corporation, with the object of violating a federal statute, can be the basis of a § 1985(3) complaint.*
>
> . . . .
>
> [S]ince neither considerations of policy nor force of precedent require adherence to the defendants' stance, we do not follow the line of cases adopting the rule that concerted action among corporate officers and directors cannot constitute a conspiracy under § 1985(3).

*Id.* at 1257-1259 (emphasis added) (footnotes omitted).

Thereafter, in *Robison v. Canterbury Village, Inc.*, 848 F.2d 424, 430 (3d Cir. 1988), the

Third Circuit distinguished *Novotny* and held that a corporation and its president cannot conspire

under section 1985 because they are a single entity. "Novotny is inapposite, as we held there only that officers and directors of a corporation can conspire with each other for purposes of section 1985(3) and therefore had 'no occasion to evaluate the force of the proposition that a corporation cannot conspire with itself.'" *Id.* at 431 (quoting *Novotny*, 584 F.2d at 1258). However, "a section 1985(3) conspiracy between a corporation and one of its officers may be maintained if the officer is acting in a personal, as opposed to official, capacity, or if independent third parties are alleged to have joined the conspiracy." *Id.*

Here, Plaintiff's Complaint alleges the Port Authority and the individual Defendants conspired amongst themselves for the purpose of depriving her right to equal protection. (ECF No. 1 ¶¶ 59-60.) Specifically, the Complaint alleges:

> 59. The *individual Defendants* acted deliberately and with malicious sexual animus and exhibited a reckless and callous indifference to Plaintiff's civil rights to be free from discrimination through their purposeful actions, willful misconduct and evil motive and are all upper-level management and supervisor employees and/or agents of Defendant PAPD and/or direct supervisors of Plaintiff. *Moreover, the custom, policy and practice of the employer caused Plaintiff to be harmed. As such, the Defendant employer is responsible for the conduct of its agents and employees.*

> 60. *Defendants* conspired amongst themselves for the purpose of depriving Plaintiff of her right to equal protection and to be free from discrimination as safeguarded under 42 U.S.C. § 1985(1), (2), and (3) and conspired to commit acts violating 42 U.S.C. § 1985(1), (2), and (3), had the power and opportunity to prevent or aid in the prevention of the deprivation of those rights, and defendants purposefully neglected, failed or refused to prevent the success of such conspiracy rendering Defendants liable to Plaintiff pursuant to 42 U.S.C. §§ 1986.

(*Id.* (emphasis added).) Therefore, Plaintiff cannot maintain a conspiracy claim against the Defendants because they are considered a single entity that cannot conspire with itself. Without a conspiracy adequately alleged, Plaintiff's § 1986 claim is dismissed because it is derivative of

Plaintiff's § 1985(3) claim. *See Gary v. Pa. Human Relations Comm'n*, 497 F. App'x. 223, 227 (3d Cir. 2012) ("Absent a valid § 1985(3) claim, [the] claim under 42 U.S.C. § 1986 [also] fails, as liability under that statute is predicated on actual knowledge of a § 1985 violation."); *Koger v. Kaplan, Inc.*, 169 F. App'x 682, 684 (3d Cir. 2006) ("Because a § 1986 claim is, by definition, dependent on a pre-existing violation of § 1985(3), that claim failed as well."). Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment as Plaintiff's civil conspiracy under 42 U.S.C. §§ 1985 and 1986 claim (Count III).

### E. Common Law Civil Conspiracy Claim (Count IV)

In her Complaint, Plaintiff also asserts common law civil conspiracy claims against Defendants, but does not distinguish those claims from the federal civil conspiracy claims in her opposition brief. (*See* ECF No. 1 ¶¶ 63-66 and ECF No. 90 at 32-35.) Defendants argue Plaintiff's New Jersey common law civil conspiracy claims should also be dismissed because Plaintiff failed to produce evidence suggesting an agreement by Defendants rising to the level of a conspiracy. (ECF No. 56-44 at 21.) They further argue New York law does not recognize civil conspiracy as an independent tort. (*Id.* at 21 n.3.)

"The Port Authority is not the agency of a single state but rather a public corporate instrumentality of New Jersey and New York." *Bunk v. Port Auth. of N.Y. & N.J.*, 144 N.J. 176, 184 (1996). Therefore, neither state may unilaterally impose additional duties, powers, or responsibilities on the Port Authority. *Id.* (citations omitted). Accordingly, the laws of one state cannot be applied to the Port Authority without the other state's consent. *hip (Heightened Independence & Progress), Inc. v. Port Auth. of N.Y. & N.J.*, 693 F.3d 345, 358 (3d Cir. 2012); *King v. Port Auth. of N.Y. & N.J.*, 909 F. Supp. 938, 945 (D.N.J. 1995), *aff'd*, 106 F.3d 385 (3d Cir. 1996); *see also Hess v. Port Auth. Trans–Hudson Corp.*, 513 U.S. 30, 42 (1994) (holding that

"bistate entities created by compact . . . are not subject to the unilateral control of any one of the States that compose the federal system"). "[T]he unilateral imposition of additional duties on the authority . . . is impermissible absent express authorization in the compact or joint legislation by the two creator states." *Ballinger v. Del. River Port Auth.*, 172 N.J. 586, 594 (2002) (citations omitted).

Pursuant to New Jersey law, "a civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act . . . the principle element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 177 (2005) (citations omitted). "The necessary elements of a civil conspiracy are: (1) a combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose, or a lawful purpose to be achieved by unlawful means; and (4) special damages." *John Wiley & Sons, Inc. v. Rivadeneyra*, 179 F. Supp. 3d 407, 412 (D.N.J. 2016). "It is enough [for liability] if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them." *Banco Popular N. Am.*, 184 N.J. at 177 (citation omitted). Primarily, the "gist of the claim is not the unlawful agreement, but the underlying wrong which, absent the conspiracy, would give a right of action." *Id.* at 178 (citations omitted).

"Under New York law, a claim for civil conspiracy may stand only if it is connected to a separate underlying tort." *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 119 (S.D.N.Y. 2009). To establish a claim of civil conspiracy under New York law, a plaintiff must demonstrate the underlying tort, plus the following elements: "(1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and, (4) resulting damage or injury." *Id.* (citation omitted).

Defendants argue that because New York does not recognize civil conspiracy as an independent tort, and the Port Authority is not subject to unilateral single-legislation, the Port Authority is not subject to a New Jersey common law civil conspiracy cause of action. (ECF No. 91 at 14.) Defendants cite no case law demonstrating the Port Authority is not subject to a New Jersey common law civil conspiracy cause of action. Indeed, other courts have allowed such claim to proceed or suggested such claim could proceed against the Port Authority if properly pled. *See Galicki v. New Jersey*, No. 14-169 (JLL), 2016 WL 4950995, at *19 (D.N.J. Sept. 15, 2016), *reconsideration denied*, No. 14-169 (JLL), 2016 WL 7494257 (D.N.J. Dec. 1, 2016); *Burke v. Port Auth. of N.Y. & New Jersey*, No. 11-6853 JLL, 2012 WL 3314761, at *6 (D.N.J. Aug. 13, 2012). Therefore, the Court will consider Plaintiff's New Jersey common law civil conspiracy claim.

Nonetheless, Plaintiff failed to produce any evidence suggesting an agreement or confederation, either explicitly or implicitly existed within the individual Defendants or the individual Defendants and the Port Authority. Plaintiff merely argues:

> The direct and circumstantial evidence reveals that the individual Defendants (Fedorko, Brown and Torres) conspired to violate Plaintiff's constitutional rights. As set forth supra, Torres directly and openly participated in the harassment of Plaintiff. Brown was in charge of the day-to-day operations of the Academy, was responsible for discipline, and was present at the Academy on a daily basis. However, he took no action to control or remediate this hostile work environment and thereby, as upper management, gave his tacit approval. Brown exacerbated this failure by failing to ensure that Plaintiff receive the required procedural protections and by recommending her termination. Furthermore, Brown's inclusion of Torres in the meeting recommending her resignation bespeaks of their collusion. Fedorko, the PAPD's ultimate authority, took no steps to enforce its anti-discrimination policies and blindly followed Brown's recommendation for termination without confirming that Plaintiff had proper remedial training or met with the Board.

(ECF No. 90 at 33-34 (citations omitted)). This allegation is not sufficient to establish a conspiracy. To establish a conspiracy, "it simply must be shown that there was a single plan, the essential

nature and general scope of which [was] known to each person who is to be held responsible for its consequences." *Morgan*, 268 N.J. Super. at 365 (citation omitted). Plaintiff fails to provide any evidence demonstrating Chief Brown or Superintendent Fedorko witnessed the alleged harassment or were aware of the harassment and Sergeant Torres actions alone cannot constitute a conspiracy under New Jersey law. Because the Court finds Plaintiff failed to produce any evidence suggesting an agreement existed between the Defendants, Plaintiff's likewise cannot establish a common law civil conspiracy claim pursuant to New York law.[6] Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment as to Count IV.

### F. Common Law Wrongful Termination Claim (Count V)

In light of Plaintiff's consent to "voluntarily dismiss[] Count V for wrongful termination" (ECF No. 90 at 1 n.1), Count V is dismissed.

### G. Intentional Infliction of Emotional Distress (Count VI)

In her Complaint, Plaintiff asserts the individual Defendants intentionally inflicted emotion distress upon her and that the Port Authority is responsible for the individual Defendant's actions pursuant to the doctrine of *respondeat superior*. (ECF No. 1 ¶¶ 71-76). She does not, address, in any meaningful manner, those claims in her brief or otherwise respond to the arguments Defendants raise in support of their motion. *Player v. Motiva Enters. LLC,* 240 F. App'x 513, 522 n. 4 (3d Cir. 2007); *Skirpan v. Pinnacle Health Hosps.,* 2010 WL 3632536, at *6 (M.D. Pa. Apr.21, 2010) (stating "[w]here a plaintiff has brought a cause of action which is challenged through

---

[6] The Court notes Defendants argue New York law does not recognize civil conspiracy as an independent tort (ECF No. 56-44 at 21), and that a civil conspiracy claim may stand only if it is connected to a separate underlying tort. *Meisel*, 651 F. Supp. 2d at 119. However, the Court need not reach Plaintiff's argument that her claim for civil conspiracy pursuant to New York law may stand because she raised claims for intentional infliction of emotional distress and assault and battery (ECF No. 90 at 35), since the Court nonetheless finds Plaintiff failed to produce any evidence suggesting an agreement.

motion for summary judgment as legally insufficient, it is incumbent upon the plaintiff to affirmatively respond to the merits of a summary judgment motion"). Indeed, Plaintiff merely argues, in pertinent part:

> [A] jury could find that Defendants' conduct was "outrageous." As set forth at length, Torres openly demanded Plaintiff on a daily basis with comments about her appearance, such as "American Girl Doll" and "Barbie Doll," and conduct designed to humiliate her, such as the "squat thrusts" and "Angelina Jolie" incidents.
>
> The fact that Torres was Plaintiff's supervisor exacerbates the outrageousness of his conduct because "the employer's position of authority and power over the plaintiff and the abuse of the employer-employee relationship can both contribute to a finding of extreme and outrageous conduct. Sexual harassment may be sufficiently outrageous where, as here, an employer retaliated against an employee.

(ECF No. 90 at 36 (internal citations omitted).) Plaintiff does not cite to any evidence in the record or case law in support of her direct claim for intentional infliction of emotional distress against Chief Brown or Superintendent Federoko. Furthermore, she fails to make any *respondeat superior* arguments against Chief Brown, Superintendent Federoko, or the Port Authority that would at all support the allegation in her Complaint. Accordingly, the Court **GRANTS** summary judgment in favor of Chief Brown, Superintendent Fedorko, and the Port Authority on Plaintiff's Count VI claim.

As to Defendant Sergeant Torres, the Court finds the evidence is more than sufficient to withstand Defendants' Motion for Summary Judgment. Defendants argue Sergeant Torres actions were not "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." (ECF No. 56-44 at 25.) Plaintiff argues a jury could find Sergeant Torres's conduct was outrageous

and that Sergeant Torres's supervisory position "exacerbates the outrageousness of his conduct." (ECF No. 90 at 36.)

To establish an intentional infliction of emotional distress claim under New Jersey law, a plaintiff must show: (1) the defendant intended to cause emotional distress; (2) the conduct was extreme and outrageous; (3) the actions proximately caused emotional distress; and (4) that plaintiff's emotional distress was severe. *Witherspoon v. Rent-A-Center, Inc.*, 173 F. Supp. 2d 239, 242 (D.N.J. 2001) (citing *Buckley v. Trenton Saving Fund Soc'y*, 111 N.J. 355, 366 (1988)). Extreme and outrageous conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Buckley*, 111 N.J. at 366 (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).

Courts have consistently acknowledged it is difficult to establish intentional infliction of emotional distress in the employment context. *See, e.g.*, *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988); *Witherspoon*, 173 F. Supp. 2d at 242; *Horvath v. Rimtec Corp.*, 102 F. Supp. 2d 219, 236 (D.N.J. 2000); *Fregara v. Jet Aviation Bus. Jets,* 764 F. Supp. 940, 956 (D.N.J. 1991); *Griffin v. Tops Appliance City, Inc.*, 337 N.J. Super. 15, 23-24 (2001). However, it is not impossible. *See Smith v. Exxon Mobil Corp.*, 374 F. Supp. 2d 406, 423 (D.N.J. 2005) (denying the employer's summary judgment motion as to the plaintiff's intentional infliction of emotional distress claim where the plaintiff was, among other things, subjected to foul and demeaning naming calling, employees made comments about her physical attributes, and pornography was left in areas she was working and forced to view); *Subbe-Hirt v. Baccigalupi*, 94 F.3d 111, 113 (3d Cir. 1996) (reversing the district court's finding that the plaintiff did not provide evidence

demonstrating conduct sufficiently outrageous when the sales manager would "berate" the plaintiff and "talk about getting her"). Furthermore,

> [a]sserting a claim of [intentional infliction of emotional distress] against a co-worker or supervisor in the hostile work environment context differs from asserting a claim of [intentional infliction of emotional distress] against a stranger on the street, because [t]he employer's position of authority and power over the plaintiff and the abuse of the employer-employee relationship can both contribute to a finding of extreme and outrageous conduct. Employers are bound by a higher duty than strangers to avoid inflicting emotional distress.

*Smith*, 374 F. Supp. 2d at 423 (citations omitted.)

Here, Plaintiff has raised an issue of material fact as to whether Sergeant Torres intentionally inflicted emotional distress upon her. A jury could find Sergeant Torres intended to cause her emotional distress, that Sergeant Torres's conduct was extreme and outrageous, that his actions proximately caused Plaintiff's emotional distress, and that Plaintiff's emotional distress was severe. *See Witherspoon*, 173 F. Supp. 2d at 242. Plaintiff alleges Sergeant Torres made comments about and observed her breasts. She contends that on November 25, 2013, when she was leaving the auditorium to go for a run, Sergeant Torres whispered in Sergeant Lubek's ear, and then Sergeant Lubek reminded the females not to forget their sports bras. (ECF No. 56-4 at 184:9-17.) In addition, Plaintiff alleges Sergeant Torres made a comment that Plaintiff "must have worked in white collar crime because [she] couldn't handle criminals." (*Id.* at 147:25-148:3.) Plaintiff also contends Sergeant Torres often referred to Plaintiff as "American Girl Doll" and "Barbie Doll." (*Id.* at 133:6-8.) Sergeant Torres also allegedly told her "he does a lot of funerals for fallen cops and he never looks at their faces, but for [her], when [she's] in [her] casket, he's going to make sure [she] look[s] pretty for [her] family." (*Id.* at 140:8-12.) Plaintiff further contends Sergeant Torres singled her out by requiring her to do squat thrusts on stage in front of her entire platoon. (*Id.* at 143:21-144:4.) Sergeant Torres also allegedly made her stand in front of

the entire platoon and show them what she looked like and referred to her as "looking like Angelina Jolie because [her] lips were so swollen." (*Id.* at 178:11-179:1.) This alleged infliction of emotional distress allegedly occurred throughout her entire time as a trainee, which was from August 19 to December 4, 2013. (ECF No. 56-1 ¶ 9; ECF No. 90-3 ¶¶ 2, 71; ECF No. 91-8 ¶ 71; ECF No. 90-4 ¶ 6.) Furthermore, the fact that Sergeant Torres was one of her supervisors and trainers throughout the Academy enhances the outrageousness of his conduct. *See Smith*, 374 F. Supp. 2d at 423. Accordingly, Plaintiff has presented sufficient evidence from which a reasonable factfinder could find that she suffered outrageous and severe emotional distress proximately caused by Sergeant Torres's actions.

As a result of the alleged distress, Plaintiff sought treated from a licensed clinical social worker, Toni Nokes (ECF No. 56-4 at 207), and underwent a psychiatric evaluation conducted by Daniel Gollin, M.D. (ECF No. 90-8 at 115). Therefore, a jury could also find such emotional distress was severe. Accordingly, the Court **DENIES** Defendants' Motion for Summary Judgment as to Count VI against Sergeant Torres.

### H.  Assault and Battery (Count VII)

Defendant argues Plaintiff's assault and battery claims fail because "Plaintiff completely and utterly fails to show any evidence of intent by Defendants to cause any harmful or offensive contact" and that "it would be preposterous to suggest that the OC spray was nonconsensual as it was a requirement for passing the Academy that the Plaintiff willingly undertook." (ECF No. 56-44 at 26.) Plaintiff argues "[w]hereas Plaintiff may have consented to the OC spray as a training exercise, she did not consent to the excessive and abusive treatment she received" because the "normal protocol" involved being sprayed by one instructor in a straight line across the eyes and

she was sprayed by multiple people, including Sergeant Torres and not limited to her eyes. (ECF No. 90 at 38.)[7]

In New Jersey:

> A person is subject to liability for the common law tort of assault [and battery] if: (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such contact, and (b) the other is thereby put in such immediate apprehension.

*Leang v. Jersey City Bd. of Educ.*, 198 N.J. 557, 591 (2009) (quoting *Wigginton v. Servidio*, 324 N.J. Super. 114, 129 (1999)); *see Russo v. Ryerson*, No. 01-4458 (JLL), 2006 WL 477006, at *36 (D.N.J. Feb. 28, 2006). "The tort of battery rests upon a nonconsensual touching." *Leang*, 198 N.J. at 591 (citing *Perna v. Pirozzi*, 92 N.J. 446, 461 (1983)).

Here, Plaintiff has raised an issue of material fact as to whether Sergeant Torres committed assault and battery against her. Plaintiff has clearly pled facts from which a jury could find Sergeant Torres intended to cause a harmful or offensive contact with Plaintiff and Plaintiff was put in such immediate apprehension. *Leang*, 198 N.J. at 591. Plaintiff alleges prior to it being her turn to get sprayed, Sergeant Torres approached her and moved her to the front of the line, presumably so that he could spray her before Chief Brown's arrival. (ECF No. 56-4 at 167:4-13.) She further alleges, unlike the other recruits, she was sprayed by multiple people, including Torres, and multiple times "because it wasn't across [her] eyes, it was in [her] ears, down [her] arms, [her] neck, [her] chest and [her] hair." (*Id.* at 174:1-19.) Plaintiff further alleges after she was sprayed

---

[7] Notably, Count VII of Plaintiff's Complaint only alleges assault and battery against Sergeant Torres. (ECF No. 1 ¶¶ 77-82). It does not refer to the Defendants collectively or mention any other Defendant individually. Further, Plaintiff's opposition papers only defend the assault and battery claim against Sergeant Torres. (ECF No. 90 at 37-38.) Accordingly, this Court interprets Count VII to be solely against Sergeant Torres.

Sergeant Torres told the platoon, "You did not see me spray. Roger that; because I'm not certified to spray." (*Id.* at 174:15-19.)

Furthermore, while to successfully complete the OC Spray course, each recruit consents to be sprayed with the OC Spray by Academy staff in a controlled setting (ECF No. 56-21 at 43), there is an issue of fact as to whether Sergeant Torres was certified to conduct an OC spray or was authorized to conduct the OC spray on Plaintiff. Indeed, Sergeant Torres's own deposition reveals:

> Q. So you never taught a class where you actually used OC spray?
>
> A. No.
>
> Q. So if you had actually sprayed the plaintiff with real OC spray, you have no reason to, correct, because you've never done that before and you never trained in that right?
>
> . . . .
>
> A. I have no reason to spray her.

(ECF No. 56-5 at 139:16-25.) Accordingly, Defendants' Motion for Summary Judgment as to Count VII is **DENIED**.

## IV.    CONCLUSION

For the reasons set forth above, the Court: (1) **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiff's equal protection gender discrimination claim (Count I) against all Defendants; (2) **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiff's due process and substantive due process claims (Count I) against all Defendants; (3) **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiff's hostile work environment claim (Count I) as to Defendants Chief Brown and Superintendent Fedorko, but **DENIES** Defendants' Motion as to the Port Authority and Sergeant Torres; (4) **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiff's First Amendment claim (Count II); (5) **GRANTS** Defendants'

Motion for Summary Judgment as to Plaintiff's civil conspiracy under 42 U.S.C. §§ 1985 and 1986 (Count III); (6) **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiff's common civil conspiracy claims (Count IV); (7) **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiff's intentional infliction of emotional distress claim (Count VI) as to Defendants Chief Brown, Superintendent Fedorko, and the Port Authority, but **DENIES** Defendants' Motion as to Defendant Sergeant Torres; and (8) **DENIES** Defendants' Motion for Summary Judgment as to Plaintiff's assault and battery claim (Count VII). Lastly, in light of Plaintiff's voluntarily dismissal, Plaintiff's wrongful termination against public policy claim (Count V) is **DISMISSED**.

**Date:** September 15, 2017                    */s/ Brian R. Martinotti*
                                                **HON. BRIAN R. MARTINOTTI**
                                                **UNITED STATES DISTRICT JUDGE**